OPINION
Plaintiff-appellant, Frank J. Rauhuff, appeals the decision of the Butler County Court of Common Pleas granting summary judgment in favor of defendant-appellee, American Fan Company, on appellant's claims for (1) termination due to a handicap in violation of R.C. 4112.02(A), (2) termination as retaliation for filing a workers' compensation claim in violation of R.C. 4123.90 and (3) termination in violation of Ohio public policy. We affirm in part and reverse in part the decision of the trial court.
Appellant began working for appellee, through a temporary employment agency, as a wheel balancer on or about September 30, 1995. He was transferred to the welding department four months later. On March 4, 1996, appellant was hired on appellee's payroll. On August 26, 1996, appellant injured his back while attempting to roll a large industrial fan. Due to his injury, appellant filed a workers' compensation claim. The claim went uncontested and was allowed by the Bureau of Workers' Compensation as a lumbar strain. Appellant returned to work September 3, 1996 on "light duty," which included balancing seven pound "Mark 7" wheels and light welding. From September 3, 1996 until December 12, 1996, appellant's attendance was not unusual. A December 16, 1996 employee evaluation of appellant indicates that appellant's attendance was rated "commendable." However, in the comment section, it states, without any detailed explanation, that appellant "could work on attendance a little."
On December 12, 1996, appellant was involved in an automobile accident. Appellant was struck by an automobile which failed to yield. Appellant testified that he went to the hospital "[t]o have my neck checked." He also testified that his lower back injury was not aggravated by the accident. Appellant missed the remainder of the December 12, 1996 workday and December 13. Appellant worked Saturday, December 14 and Monday, December 16 through Wednesday, December 18 of the following week.
From December 19 until the end of the month, appellant worked only two and one-half hours. The week of December 23 through December 27 included three days of vacation and two holiday days. Appellant returned to work on January 2, 1997. From January 15 until February 14, appellant worked eight days and missed thirteen days of work. Appellant's absence report of January 15 states that "[e]mployee called again and told me he hurt his back again last night at work. He went to the doctor and was not allowed to come in today." On January 16, 1997, appellant's absence was reported by Penny Lynch,[1] who brought in a "doctors excuse." The absence report states that appellant "wouldn't be allowed to return to work until 1-27-97." On January 23, 1997, appellant received a warning from Kevin F. Shrewsbury, welding supervisor and second shift supervisor, about "missing too much work especially when [Lynch] was absent also." An absence report dated February 10, 1997 states that "[appellant] called to tell me his Doctor had him off for the week of 2-10-97 thru 2-14-97. Penny Lynch Brought the Doctors Excuse."
On February 10, 1997, appellant filed an additional workers' compensation claim, seventeen days before he was terminated. A March 3, 1997 letter from the Bureau of Workers' Compensation states that appellant's claim was additionally allowed for "lumbar disc displacement." Appellee received notice of the allowance of the claim on March 10, 1997. Shrewsbury first learned of appellant's intention to file a second workers' compensation claim in January 1997. He testified about his impression of the second workers' compensation claim, which occurred after appellant's automobile accident:
 So after the wreck and he suddenly develops these herniated discs and now he's telling me that's related back to this Workers' Compensation injury in August, I didn't believe him for a second. I even went and I told the plant superintendent, I said, look, we're trying to keep our Workers' Compensation costs down and here we've got a guy that looks like he's going to try to get this like he's going to try to get this taken care of for free from Workers' Compensation. That man that he hit in this wreck, the guy that pulled out in front of him had no insurance. I know that for a fact.
Later in his deposition, Shrewsbury was asked by appellant's counsel if he was upset that appellant "was going to try to get this taken care of under Workers' Compensation"? Shrewsbury testified that "I wouldn't say upset. It was just that I didn't think it was right. I mean, there's a lot of people out there that try to get the free ride, is the way I'd call it." Shrewsbury testified that he "was kind of hoping he [appellant] might have seen it my way" and not file an additional claim.
On February 14, 1997, Valentine's Day, appellant and Lynch were both absent. After a meeting between Dave Nadler, Plant Superintendent, Donna Brown, Human Resource Manager, and Shrewsbury, the final decision was made by Nadler to terminate appellant's employment. The record indicates Nadler largely relied on the absences in January and February 1997 when he fired appellant for "excessive absenteeism" on or about February 27, 1997.
Nadler testified he was not aware of the medical excuses appellant had provided for some of his absences. Nadler testified that he considered that many of appellant's absences were unexcused and undocumented in his decision to terminate appellant. However, in another response in the same deposition, when Nadler was questioned about the distinction between unexcused and excused absences, he stated that:
 Again, if somebody calls in and says, I'm off sick, something like that, they may mark it excused. But you have to, again, look at the whole picture, the whole scenario, what the whole record is of an individual, and then make a determination, you know.
 If you had one excused absence, yes, okay he was sick, maybe it was excused. Now, all of a sudden, you have a whole scenario of absences. Excused or not excused, they're still in excess.
Nadler was also concerned about the fact that Lynch and appellant's absences coincided on many occasions, the final instance being Valentine's Day. The affidavit of Donna Brown, paragraph 10, states that eight other welders were terminated "for excessive absenteeism" and "[appellant's] attendance record was significantly worse than any of these individuals' records."
According to Shrewsbury, appellee generally followed a four-step process for disciplining an employee. A summation of the four steps are (1) verbal warning; (2) written warning; (3) probation; and (4) termination. This process is outlined in the employee handbook on page ten under the heading, "Disciplinary Procedures." The procedures also state that "[t]he seriousness ofthe offense will determine which step in the disciplinary processwill be exercised, very severe infraction could warranttermination." (Emphasis in original.) Shrewsbury testified that this four step process was a "company discretion type thing."
In addition, a document prepared by a Daniel E. Mazzaferni addressed employee absenteeism. The document reads as follows:
POLICY EFFECTIVE 1/1/92
ABSENTEEISM DISCIPLINARY GUIDE
12 MONTH PERIOD
OFFICE and PLANT
 Unexcused Absence: (Any absence NOT related to an illness/injury, family emergency, jury duty, or funeral)
4 days in a (3) month period—1st written warning
6 days in a (6) month period—2nd written warning
8 days in a (9) month period—3 days off W/O pay
12 days in a (12) month period—discharged
These are consecutive months.
 It is the responsibility of the Dept. Supervisor/Manager to implement the disciplinary procedures of their employees.
 Any excused absence must be documented and a copy sent to the Personnel Department for the employees file.
 Any employee absent for more than 5 days due to illness will be required to submit a doctor's excuse stating the nature of the illness.
Shrewsbury testified that following these guidelines was within the discretion of management. Nadler testified that he relied on the Mazzaferni memorandum as a guideline. He stated that "[t]he other guideline is just based on good business practice."
Appellant filed a complaint alleging the following causes of action: (1) age discrimination; (2) handicap discrimination; (3) retaliation for filing a workers' compensation claim; (4) violation of the Family Medical Leave Act of 1993; and (5) discharge contrary to public policy. Appellee moved for summary judgment on all of appellant's causes of action. Appellant contested the motion on causes of action two, three and five only. The trial court granted appellee's motion for summary judgment in its entirety. From this decision, appellant filed a timely notice of appeal and presents one assignment of error for our review:
 The Trial Court Erred To The Prejudice of Rauhuff In Finding He Was Not Handicapped Under Revised Code 4112.02(A).
We initially note that although appellant's only assignment of error concerns the handicap discrimination claim, appellant's second and third "issue for review" under the assignment of error address the other two contested claims for which the trial court granted appellee summary judgment. Although these other two issues for review do not relate to the assignment of error as required by App.R. 16(A)(4), in the interest of justice, we review all three claims.
Pursuant to Civ.R. 56(C), "the appositeness of rendering summary judgment hinges upon a tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 66. This court reviews a trial court's decision to grant summary judgment de novo. Jonesv. Shelley Co. (1995), 106 Ohio App.3d 440, 445.
Appellant argues that the trial court erred by finding appellant was not handicapped and granting summary judgment to appellee on appellant's handicap discrimination claim. R.C.4112.02(A) states that "[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * handicap * * * of any person, to discharge without just cause * * *." In order to establish a prima facie case for wrongful termination due to a handicap, a plaintiff must show that (1) the plaintiff is handicapped; (2) the plaintiff was terminated, at least in part, due to her handicap; and (3) the plaintiff can still safely and substantially perform the essential elements of her employment."Morgan v. Taft Place Medical Center (June 8, 1998), Butler App. No. CA97-12-226, unreported, at 6, citing Hood v. DiamondProducts, Inc. (1996), 74 Ohio St.3d 298, 302, and Hazlett v.Martin Chevrolet, Inc. (1986), 25 Ohio St.3d 279, 281.
The trial court concluded as a matter of law that appellant's back injury does not meet the definition of a "handicap." We agree.
R.C. 4112.01(21) defines a "[h]andicapped person" as a "person with a handicap." "Handicap" is defined in R.C.4112.01(A)(13) as
 a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of physical or mental impairment; or being regarded as having a physical or mental impairment.
Thus, the question is whether appellant's back injury qualifies as a handicap and/or did appellee perceive appellant to be handicapped.
Appellant has never been found to be permanently disabled by the Bureau of Workers' Compensation. Instead, he was receiving "temporary total disability" payments from the Bureau. Appellant's deposition indicates that with therapy, he could return to work. The testimony of Shrewsbury was that, in January and February of 1997, appellant was having difficulty performing his job tasks due to his injury. However, there is no evidence in the record that Shrewsbury, or anyone else in management, considered his injury permanent.
Appellant's back injury does not rise to the level of a "handicap" as contemplated in R.C. 4112.02(A)(13). At the time appellant was terminated, his injury did not have "such permanent or long term impact as to render him substantially limited in performing routine labor duties." Kemo v. The City of St.Clairsville (June 4, 1998), Belmont App. No. 96-BA-78, unreported, at 14, discretionary appeal not allowed, 83 Ohio St.3d 1452. Moreover, appellant's "burden is to establish that [appellee] regarded him as substantially limited in his ability to perform such fundamental and routine tasks as are necessary to exist in everyday life, not merely to establish that appellant regarded him as limited in his abilities to perform the specific tasks associated with a specific job." Id. at 14-15. At the time appellant was terminated, he was generally able to work as long as he was limited to "light duty."
Appellant argues that he was perceived as being handicapped and particularly focuses on the testimony of Shrewsbury. Shrewsbury testified that appellant was performing light duty as a wheel balancer to accommodate his back injury. Shrewsbury was asked if appellant "was able to perform the job functions associated with that function." He answered that:
 According to him and the way he was acting, it didn't look like he was able to perform at all. He kept claiming his back was hurting real bad. When he was here, he was doing the work, you know, but maybe not as much as he should have been doing. When I've got somebody that's hurting, you know, I'm not a barbarian or nothing. I mean, I'll cut them some slack. And if they do a little less, it doesn't bother me. (Emphasis added.)
Shrewsbury's statement, at most, shows that appellant was having difficulty performing his job due to his back injury. When read in context, it does not indicate appellant was perceived as handicapped. Again, there is no evidence appellant's injuries were perceived as permanent or substantially limiting his ability to perform a major life activity at the time he was terminated. See Maloney v. Barberton Citizens Hosp. (1996), 109 Ohio App.3d 372,376. Since appellant cannot show that he was handicapped or perceived as such by appellee, the handicap discrimination claim cannot survive summary judgment.
Appellant next argues that he was terminated for filing and pursuing a workers' compensation claim. R.C. 4123.90 states in pertinent part that
 [n]o employer shall discharge, demote, reassign or take any punitive action against an employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.
In order for an employee to present a prima facie case for workers' compensation retaliatory discharge, a plaintiff must present evidence "(1) that the employee was injured on the job, (2) that the employee filed a claim for workers' compensation, and (3) that the employee was discharged in contravention of R.C.4123.90." Kilbarger v. Anchor Hocking Glass Co. (1997),120 Ohio App.3d 332, 337-38, discretionary appeal not allowed, 80 Ohio St.3d 1436, citing Wilson v.Riverside Hosp. (1985), 18 Ohio St.3d 8, syllabus. If an employee creates a prima facie case, the burden shifts to the employer to provide a legitimate nonretaliatory explanation for the discharge. Kilbarger at 338. "[I]f the employer sets forth a legitimate, nonretaliatory reason, the burden once again shifts to the employee. The employee must then establish that the reason articulated by the employer is pretextual and that the real reason for the discharge was the employee's protected activity under the Ohio Workers' Compensation Act." Id.
Appellee argues that appellant lacks standing to bring a claim because, before appellant's termination, it only had notice that appellant intended to file a claim. The Supreme Court of Ohio has addressed the definition of an "institution" or pursuance" of a claim. In Bryant v. Dayton Casket Co. (1982),69 Ohio St.2d 367, the court held that "[R.C. 4123.90] applies only if the employee had been discharged after taking some action which would constitute the actual pursuit of his claim, not just an expression of an intent to do so." Id. at 371. The court stated that in order to "trigger the R.C. 4123.90 protections," an appellant must show "more than the mere oral communication of an intent to pursue a claim." Id.
The second claim, the one which appellant argues contributed to his firing, was filed February 10, 1999. This was seventeen days before appellant's termination. The fact that appellee did not receive notice of the allowance of the claim until March 10, 1999 does not alter the fact appellant had "initiated" a claim within the plain meaning of R.C. 4123.90. Accordingly, appellant has standing to pursue a claim under R.C. 4123.90.
Next, we turn to the elements of a workers' compensation retaliation claim. As noted, appellant did file a second claim before his termination for an additional workers' compensation allowance. That claim was ultimately allowed by the Bureau as work-related. Therefore, the only element in question at the summary judgment stage is whether appellant was terminated, at least in part, for filing the second claim. Shrewsbury's comments that appellant was attempting to cheat appellee by filing a claim for injuries unrelated to work establish this element. Thus, appellant has shown a prima facie case of workers' compensation retaliation.
Under the burden-shifting analysis for workers' compensation retaliation claims, an employer is entitled to show a legitimate business justification for an employee's termination. At that point, the plaintiff must present evidence that the employer's explanation is a pretext for the termination. Kilbarger,120 Ohio App. 3d at 338. Appellee argues that appellant was terminated due to excessive absenteeism. We agree that the record may support the position that appellant's absenteeism was considered a disciplinary problem by management. Nevertheless, it is not entirely clear how appellee assessed excused versus unexcused absences or that management applied absenteeism policies consistently.[2] This, in itself, would not support the argument that the absenteeism argument was a pretext for appellee's termination. However, when read in concert with the testimony of Shrewsbury, a question of fact exists as to whether the "excessive absenteeism" explanation was a pretext.
Shrewsbury indicated that he viewed the workers' compensation claim as fraudulent and urged appellant not to file such a claim. Cf. Blair v. Milford Exempted Village Sch. Dist. (1989), 62 Ohio App.3d 424,431 (no evidence that the plaintiff was terminated in retaliation for filing a workers compensation claim.) Appellee argues that Nadler made the ultimate decision to terminate appellant, but according to Nadler, Shrewsbury "participated" in the decision to terminate appellant. Therefore, a reasonable trier of fact could conclude that Shrewsbury's views influenced the ultimate decision to terminate appellant. Accordingly, the trial court erred by granting appellee summary judgment on appellant's workers' compensation retaliation claim.
Finally, appellant filed a separate public policy cause of action stating that he was terminated for filing a workers' compensation claim and, therefore, his termination violated the public policy of Ohio. The practical importance of such a cause of action is that under R.C. 4123.90, a plaintiff is limited to "reinstatement with back pay." Under a common law cause of action, appellant would be able to seek a full range of remedies. In addition, although we have never directly addressed the issue, it is problematic whether trial by jury is available under R.C.4123.90. See Gallaher v. Western Southern Life Ins. Co. (Dec. 10, 1986), Hamilton App. No. C-860062, unreported (holding that the remedies of R.C. 4123.90 are "essentially equitable" and "therefore no right to a jury exists").
In Hyatt v. Neaton Auto Products Mfg., Inc. (1995), 103 Ohio App.3d 591,594, this court held that R.C. 4123.90 provides an exclusive statutory remedy for termination in retaliation for the filing of a workers' compensation claim. We concluded that the Supreme Court of Ohio's decision in Greeley v. Miami ValleyMaintenance Contrs., Inc. (1990), 49 Ohio St.3d 228, which generally allowed common law public policy claims for statutory violations, did not apply because the legislature had provided a private remedy as part of R.C. 4123.90. However, in Kulch v.Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, certiorari denied, __ U.S. __, 118 S.Ct. 586, the court stated that Greeley
does apply even where a statute provides a remedy. Kulch
addressed Ohio's Whistleblower Statute, R.C. 4113.52. Based on the Kulch decision, we determined a plaintiff could maintain a common law cause of action based on the public policy embodied in the Whistleblower Statute. Lawson v. AK Steel (1997), 121 Ohio App.3d 251,255.
In Livingston v. Hillside Rehab. Hosp. (1997), 79 Ohio St.3d 249, the Ohio Supreme Court, on authority of Kulch, recognized a public policy cause of action for an age discrimination claim despite the fact Ohio's age discrimination statute, R.C. 4112.14, provided a full range of remedies. The only limitation of R.C.4112.14 was that the statute does not provide for trial by jury. Accordingly, based on Kulch and Livingston, we find that our decision in Hyatt has been overruled and a common law public policy cause of action is potentially available to appellant "in addition to or in lieu of his statutory cause of action" under R.C. 4123.90. Kulch at 149; see Boyd v. Winston Hills Medical andHealth Center, Inc. (Mar. 5, 1999), Hamilton App. No. C-980355, unreported, at 7.
In order to establish a public policy cause of action, appellant must meet a four-part test:
That [a] clear public policy existed and
 was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element).
 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). (Emphasis in original).
 Kulch at 151, citing Painter v. Graley (1994),70 Ohio St.3d 377, 384, fn. 8 (citation omitted). The first two elements must be determinated by the court as a matter of law and the final two elements are questions of fact for the jury.Kulch at 151.
The first element is met by the clear public policy in R.C.4123.90 of allowing employees to use the workers' compensation system without fear of reprisal. The second, or "jeopardy" element is met because, construing the evidence in the light most favorable to him, appellant has established a prima facie case of workers' compensation retaliation and, therefore, his case directly implicates the aforementioned public policy. The second element is also met because offering appellant a full range of remedies under a public policy cause of action complements the statutory remedies of R.C. 4123.90. See Kulch at 155-56. Thus, the public policy claim survives summary judgment and appellant can seek common law remedies in addition to those allowed under R.C. 4123.90.
Thus, the first assignment of error is well-taken with regard to the R.C. 4123.90 workers' compensation retaliation claim and the corresponding public policy claim. The trial court's decision granting appellee summary judgment on appellant's handicap discrimination claim is affirmed.
Judgment affirmed in part, reversed in part and remanded for proceedings not inconsistent with this opinion.
WALSH and VALEN, JJ., concur.
[1] At the time, Penny Lynch was an employee of appellee and appellant's girlfriend.
[2] Of course, appellee was not obligated to follow the handbook policy or the Mazzoferni memorandum. Nevertheless, in viewing the evidence in the light most favorable to appellant, the testimony of how the company treated excused absences raises an issue of whether appellant was treated in a somewhat arbitrary manner (i.e., differently from other similarly situated employees). This fact, combined with Shrewsbury's testimony, raises the issue of whether the termination was, in least in part, related to the workers' compensation filing of February 10 and the excessive absenteeism was a pretext.